Case number 17-5067, Moath Hamad Al Alwi appellant v. Donald J. Trump, President et al. Mr. Kassim for the appellant, Ms. Carson, Diapolese. Thank you, Chief Judge Garland. Good morning, Your Honors. May it please the Court, my name is Ramzi Kassim of Main Street Legal Services, Inc., at the City University of New York School of Law, appearing for Mr. Moath Al Alwi, a captive of Guantanamo Bay. With me at counsel table is my colleague, John Conley, of the law firm of Zuckerman Spader, LLP. With the Court's permission, I'd like to reserve five minutes for rebuttal. Mr. Alwi has been in U.S. custody at Guantanamo more than 16 years, and he faces the prospect of lifelong non-criminal detention. The government claims limitless authority to detain him for as long as it deems necessary, despite the fact that the Supreme Court viewed these wartime detentions as temporary and non-cunative. The question presented is whether in our constitutional system of government, there is any limit, either statutory or constitutional, on the executive's authority to detain Mr. Alwi, potentially for life. We submit that because the practical circumstances of past law... I mean, is the way you... I mean, hasn't the Supreme Court, at least on one occasion, anticipated that detention will last for a generation, even longer, given the unusual nature of these conflicts? Your Honor, the Supreme Court has noted the unusual and rather unparalleled nature of this conflict in both Hamdi and Boumediene. But let's start with Hamdi. There, in the plurality opinion, the Court clearly anticipated a conflict so unlike previous conflicts, so unlike past wars that informed the development of the law of war, that at some point in time, the judiciary would have to step back in... Your Honor, the only point I'm making, you'll acknowledge, won't you, that in Boumediene and in Hamdi, I believe, the Court actually used that language, anticipating that imprisonment may last for a generation, right? Your Honor, the... So I'm just focusing on the length of the imprisonment. Now, I understand your argument that things have changed. We have a new, perhaps a new type of battle, a new type of conflict. But I'm just seizing upon your point that it's supposed to be temporary. The Court has recognized that under certain circumstances, it may be a very, very long time, a generation. Well, Your Honor... Isn't that right? Your Honor, let me... Isn't that right? Haven't they said that? Well, Your Honor, what they said, and let's start with Justice O'Connor and Hamdi. Justice O'Connor took Hamdi's objection to the lack of certainty regarding the date on which the is not far-fetched. And it says, well, as of this date, we have not reached that point where a detention authority may have unraveled due to the passage of time. But Justice O'Connor and Hamdi, the Supreme Court in Boumediene clearly left the door open. And actually, the language in Boumediene, Your Honor... All I'm getting you to say is they used the phrase, could be a generation, right? That's correct, Your Honor. But their use of that phrase actually cuts in our favor. When you look to the language in Boumediene, the Supreme Court majority held, because our conflicts have been of limited duration, it's been possible to leave the outer boundaries of war power undefined. But, and this is the language from Boumediene, if, as some fear, terrorism continues to pose dangerous threats to us for years to come, the court might not have this luxury. The court would have to come back in and revisit the scope of AUMF detention authority, potentially read in a durational limit, either as a matter of statutory interpretation or as a matter of constitutional interpretation, Your Honor. And so the fact that you're pointing out that both the majority in Boumediene and the plurality in Hamdi recognize the unparalleled nature of this conflict is the very reason we are here before this court today to say that due to that fact, given the reality that the scenario Hamdi envisioned in 2004, that that scenario has come to pass today in 2018, that the scenario that Justice O'Connor viewed as not far-fetched, that the possibility of present and palpable today in 2018 for Mr. Alwi, that at this point in time, the judiciary has to step back in. Because what the court said in Hamdi was that detention for life, for the purpose of interrogation, was not permissible. And it did give credence to the concern that was raised by Hamdi. But for the purposes of interrogation, what about for the purposes of keeping somebody off the battlefield? Well, Your Honor, at this point in time, so let's focus on Hamdi. Hamdi acknowledged that there may come a point when detention authority may unravel if the conflict's circumstances are so different from those of past conflicts. What Hamdi said was, well, in 2004, as of this date, quote-unquote, we have not reached that point. What we would like to draw the court's attention to today in 2018 is that Mr. Alwi remains at Guantanamo more than 16 years after he was taken into captivity, and that other practical circumstances of the conflict in Afghanistan indicate that this is a conflict unlike any others, and that we have reached that point. If we disagreed with you on that, if we thought this was the same type of conflict, just maybe a different iteration of it, that your argument disappears, right? It's the same conflict. Because the Supreme Court has already anticipated there could be multigenerational imprisonment here. Well, Your Honor. So your argument has to turn on that this is a fundamentally different conflict, right? Your Honor, that ship has already sailed, with respect. I mean, Boumediene recognized that this conflict was unparalleled due to its unprecedented duration in 2008, and here we are 10 years later. And so the Supreme Court, on three occasions, has stressed that the duration of the conflict is a relevant indicator for when the court should step back in and revisit detention authority. And Mr. Alwi would respect that. Duration alone? I thought your argument was that it had to be fundamentally, it had to be a different sort of conflict. It's the same conflict that started in 2001 and continued. It's the same conflict. It's hypothetical. Same conflict. Duration means nothing. Well, Your Honor, our primary argument, in fact, assumes that it is the same conflict. So let's assume that the conflict that began in 2001 endures today in Afghanistan. That it's the one, single, continuing conflict. The importance of the passage of time and its relevance to detention authority has been stressed at three points by the Supreme Court. Now, the Supreme Court says, well, twice by the Supreme Court and once by Justice Breyer in his statement accompanying denial of cert in Hussein in 2014. But what the Supreme Court is saying, look to the practical circumstances of the conflict, including duration. So the Supreme Court happened to highlight duration. That's not the only one. We're trying to draw the court's attention both to the unprecedented duration of detention and of the conflict. Mr. Ali remains at Guantanamo 16 years in. His detention was supposed to be temporary. Hamdi quoted Winthrop. That law of war detention is supposed to be non-criminal, non-punitive, and temporary. Sixteen years in, it's none of those things for Mr. Ali. And so that's the Supreme Court telling you to look to the duration of the conflict. Look to the duration. Assume, continuing on this assumption, that it's the same conflict that just long. What do we look to? So, Your Honor, the passage of time is one thing. Well, I understand there's a passage of time, but what body of law? So you say international law assumes a shorter period of time, but you haven't cited any international law for the proposition that after a long time something changes. So, Your Honor, the reason why this is murky as a matter of law of war, as a matter of International humanitarian law is very clear when it comes to international armed conflicts between two state parties. So there we have Geneva Convention 3, Article 118, for the detention of combatants. Geneva Convention 4, Article 133, for the detention of civilians. But when it comes to a non-international armed conflict, which, you know, let's assume this conflict in Afghanistan today is a non-international armed conflict. I thought we were going to continue it along the way we were assuming before, that this is an international armed conflict and that it's just a long one. Under those circumstances, what would we look to? So far the courts only look to Geneva 3. What do we look to? I take the point that maybe international law didn't contemplate this, but then we still need some body of law to look to, okay, now what? Absolutely, Your Honor. Let me answer that question. I have to say, none of your citations support the proposition that in a very long conflict that there's a different test. They don't say what the test might be, but they don't suggest another test. So, Your Honor, let me answer those questions. Again, we're assuming it's a single conflict, and even if it's morphed from an international armed conflict to a non-international armed conflict, it's had different phases, it's still the same single continuing conflict. In non-international armed conflict, the reason why we don't have much clarity on the standards and procedures that would obtain is because the assumption of the framers of the Geneva Convention was that non-international armed conflicts would be domestic, internal conflicts involving a state party and a non-state party. And so there, if you're detaining a member of a domestic level group, you would process that person through domestic law, using domestic procedures. And so that's the assumption of the framers of Common Article 3 of the Geneva Conventions. So what we would suggest is that in this context, where it's a non-international armed conflict, you have to look to not just Common Article 3, but you have to look to domestic law. That's consistent with the international law of war. Now, domestic authority means, in this case, revisiting detention authority under the AUMF in keeping with what the Supreme Court tells us is appropriate at this point in time. We're not just resting our argument on the passage of time, Your Honor. The passage of time is one of the practical circumstances. We're still left without a body of law to turn to. So when the Supreme Court interpreted the AUMF, they interpreted it as extending until the end of hostilities and the relevant conflict. If we continue on this hypothetical, assume it's the same relevant conflict, I understand there's a dispute about whether there's still hostilities. Assume there is, because that's part of this hypothetical. What tells us what to do when it gets very long? So, Your Honor, if we have reached this point in time where we're certainly – well, I guess another way to put it, Your Honor, is if not now, when? So let's set aside the question. Now you're asking me the question. I have to ask you the question. If I had the answer, I wouldn't be asking you the question. Yeah, well, Your Honor, we would look to – well, let me first clarify how we reach this point. We reach this point because of the passage of time and because of the bilateral security agreement that defines the framework of this conflict. I understand all that, but we are starting, and you're free to argue that point as well, but I want to stick one point at a time, and the one point at a time was Judge Griffith's hypothetical and your acceptance of the hypothetical for purposes of the argument that we're in the same conflict. It's just really long and may be perpetual or at least looks like it right now. What body of law do we look to, is your question? Your Honor, the body of law that we look to is what habeas, what the suspension clause requires, what the due process clause require at this point in time. And again, that is in keeping with our domestic jurisprudence, and it's actually in keeping with international humanitarian law as well. So you're not pointing to me some body of international law. You want us to look here at this point at domestic law. We're actually arguing, Your Honor, that the two bodies of law are congruent on this point. International humanitarian law tells you that for the detention of civilians, because there are no combatants in non-international armed conflict. There are only civilians. For the detention of someone like Mr. Ali in a non-international armed conflict, you have to look to— Let me just answer your question, Your Honor. You have to look to the reasons both for the initial detention and the continuing detention. So you have to assess whether detention today serves the purpose of keeping Mr. Ali off the battlefield today, not just back in 2001. That's IHL. That's actually consistent with domestic law. We're contending that due process and the suspension clause requires the court. We did decide initially that he was a combatant. And under those circumstances, your argument is he's no longer a combatant, that something has turned him into a civilian, the length has turned him into a civilian. Is that the nature of the argument? So, Your Honor, let me clarify one thing. The finding of this court in 2011 was that he was detainable as an enemy combatant under U.S. law. Right. The international humanitarian law understanding in a non-international armed conflict is different. You told me to apply domestic law, and we've decided already that he was a lawful combatant. And, Your Honor, this case does not seek to relitigate that finding. Right. So that finding was about Mr. Ali's original detention, whether the government had the authority to detain him initially. This case asks whether today, in 2018, 16 years into that detention, detention remains lawful. So it's a different question. Right, but so your argument has to be that he's now a civilian? Because you said that international human law is applicable to civilians. Forgive me for muddying the waters, Your Honor. I was just trying to make a minor technical point that the international humanitarian law of non-international armed conflict does not recognize combatants. There is no such thing as a combatant. But that may be an academic point. We don't need to show that he's a civilian in order to prevail. What we need to show, Your Honor, is that his detention today is no longer lawful under the AUMF, or if the AUMF is construed to permit indefinite detention for Mr. Ali, continuing detention, that that construction of the AUMF is unconstitutional. Wait, wait. I'll just one second. Unconstitutional under a substantive due process. Your Honor, under a substantive due process or in the alternative procedural due process requires remand with stronger protections. I'm going to pause over both of those. I looked at the arguments that were raised. I noticed that the district court did not address either argument, neither substantive due process nor procedural. And I looked at your habeas petition, which, you know, recites the normal rule held in, which is statutorily required, held in violation of the Constitution and laws. But the argument in it is that it extends beyond the authorization for the use of military force and it extends beyond customary international law and the Convention Against Torture. And there's no mention of either procedural or substantive due process. And in your opposition to the government's argument, you say, again, I mean, the closest you come is to say, even where the court to determine the relevant conflict endures, Mr. Auli's indefinite imprisonment is unlawful. But you don't, in the next, in the two paragraphs on that subject, you do not address any constitutional argument, any substantive or procedural due process. And likewise, your only other argument is that he retains his rights under customary international law. So I'm asking whether we are now not facing an argument that was not raised before the district court. Your Honor, we argued below that the duration of the war and of his detention undermines the government's statutory authority. I can point you, but our oral argument, I can also point you to the section of the joint. So you agree on the papers. I haven't missed something. There's no reference to substantive or procedural due process in the papers. So, yeah, that's correct, Your Honor. Hold on one second. Let me now find the, a lot of appendices here. But here, I also couldn't find it, but it was longer, so maybe you can tell me where it is. Where is the reference? So, Your Honor, for example, at oral argument below, we asked whether, and this is at joint appendix 1327, 1328. Right, among those pages, right. We asked whether there should be a limit to detention under the authorization for use of military force or a constitutional limit to detention, end quote. And that flows from the section of our opposition to the government's motion to dismiss that you identified earlier, Chief Judge Garland. Right, but where is a description of what the constitutional limit is? So, Your Honor, we need not, we're entitled to explain on appeal that not adopting the interpretation of the AUMF we urge would require resolution of a weighty constitutional issue. In other words, our presentation of the argument need not match. I understand the avoidance argument, and I'm not suggesting that that's been forfeited, but that's still only a statutory interpretation question. If you want to, I take it, it sounds from your brief you also want us to hold that if we don't agree with you on the construction argument, that there's a violation of substantive due process. And that argument, I'm afraid I just don't, I don't find a citation to any substantive due process case. I don't find a reference to the Shock the Conscious test. I don't find anything that would alert the district court that this is an issue, and apparently the district court didn't see it that way because the district court didn't rule on it. The government didn't file any oppositional papers with respect to the Shock the Conscious test or procedural due process. Your Honor, we certainly tried to raise it and to explain it in our argument as an argument about constitutional limit to detention. Obviously, we don't control what the district court decides to spend ink on in a decision, but ultimately. But you do control what you intend to expend. Of course. Trying to think of the opposite of ink, voice, and I don't see it in the hearing. I don't see the word substantive due process. I don't see any case citations. So, Your Honor, we, so let me try to address this in a different way. Under E.V.S. Candido, we aren't required to present the argument in exactly the same way. And, Your Honor, E.V.S. Candido also holds that in cases arising from federal courts, the rules having to do with forfeiture are prudential only. And we would submit that if this court's view is that some of the arguments, for example, pertaining to procedural due process, are forfeited, that this court can still, in its discretion, in the interest of justice, to avoid that, to avoid an exceptional outcome for Mr. Alvey or a patent injustice for Mr. Alvey, this court can still decide the issue. And, in fact, that's what Boumediene did. When, instead of remanding the question whether the CSRTs were an adequate substitute for habeas, Boumediene decided to take it on in the first place because the cost of delay should not be borne by the detainees, were the words in Boumediene. And we would submit that 16 years into Mr. Alvey's detention, he should not be made to bear the cost of delay. The court, in its discretion, can address the arguments that have been raised on appeal. If the court decides, because the arguments were forfeited in its view, to remand for adjudication below, then that's just going to spell years-long delay for Mr. Alvey. The issues will eventually work their way back up to this court, inevitably. That's been the history of this litigation. And so we would submit, again, Your Honor, this is a prudential rule that the court can depart from. And let me point out that the government has only argued that we forfeited our procedural due process arguments. They haven't argued forfeiture more broadly. Certainly the court can take a different position. But, again, the rule is prudential. And in this case where injustice may result. Let me ask a question. Let's assume you didn't forfeit it. Why don't our two decisions in al-Bihani and al-Ota, in which we rejected heightened due process, answer your claim? So, Your Honor, for a number of reasons. The procedural challenge in al-Bihani, for example, was different. Al-Bihani took issue with the fact that habeas procedures did not match those for review of criminal proceedings. We today do not seek parity with review of criminal proceedings. Moreover, Your Honor, time, again, and this is our argument, time alters the calculus. So just because al-Bihani failed on a procedural challenge under very different factual circumstances in 2009, 2010, does not mean that Mr. Alvey today should fail. Our argument is that with the passage of time, given what the Supreme Court has already said, in Hamdi, in Boumediene, in Hussein, there needs to be more robust habeas review, lest the AUMF be taken to justify lifelong detention in a way that would be unprecedented, both under our own domestic case law and under international humanitarian law, which was devised that the law of war was devised as a limit to detention, not to permit lifelong detention. I want to go back to the duration point. I'm going to read you a short sentence or two from our decision in Ali v. Obama in 2013. Tell me, I must be missing something according to your argument. We wrote, we are, of course, aware that this is a long war with no end in sight, but the 2001 AUMF does not have a time limit, and the Constitution allows detention of enemy combatants for the duration of hostilities. Now, the line of questions that both Chief Judge Garland and I were asking assumed that this is the same conflict. Haven't we already said that time doesn't work the change that you're urging us to work here? Haven't we already resolved this issue? Wouldn't we have to, in fact, overrule what we said in Ali v. Obama? So, Judge Griffith, the language that you've just quoted from Ali v. Obama is clearly dicta. The petitioner in Ali did not argue that the duration of his detention violated due process or was otherwise unlawful. He did not argue the constitutionality of procedures. The only issue in Ali, the only issue, was whether Ali's brief presence in a guest house standing alone was itself sufficient to justify detention. But you recognize that that language, that language. Your Honor, that language. It's a significant barrier to your argument. I do not, I do not, Your Honor. That language is there. I definitely recognize there. I definitely recognize that the language is there. But your avoidance is that it's dicta, right? It's dicta. It does not foreclose consideration of the issue by this panel because when you look at the record in Ali, when you look at argument, when you look at the briefs, and I've spoken to counsel in that case, the argument was never raised, briefed, or argued in any way, shape, or form. And therefore, for whatever reason, the panel decided to include that language, but it does not foreclose consideration of the issue by this panel. You said, I think at least twice in your papers below, that you weren't disputing for purposes of this case the findings in the previous case. Is that right? Your Honor, we aren't disputing the findings in the previous case, but what we are saying is that at the very least, at this point in time, on remand, if this Court were to decide that at least remand is appropriate, that there has to be a more fulsome habeas review process that looks to, that reevaluates that initial determination on a stronger set of procedural protections? You haven't made the argument that you could get relief if we use, for example, a clear and convincing evidence standard. So, Your Honor, let's assume, so assuming hypothetically that the Court were to remand for reconsideration, applying clear and convincing evidence as a standard, right? So at that point, the question being asked is a broader question. It's both the original reason for detention, so what was evaluated by the Court up until 2011, and continuing reason for detention. Does detention still serve its purpose today? But even if the record were limited, even if— On the factual question of whether he satisfies the requirements, you haven't argued that if we use a clear and convincing rather than preponderance test, that the result would come out differently. Your Honor, we, so let me clarify that here. If the same record that has, if on remand a Court were to consider the exact same record, applying a clear and convincing evidence standard, applying stronger procedural protections, I do believe, even if it's just a clear and convincing evidence standard, that is a more critical review of a body of evidence that includes admissions and interrogations under questionable circumstances reflected by triple or sometimes quadruple hearsay. I think a Court applying that sort of critical lens to the record that exists in this case may well come out differently. Now, I can't guarantee that, but I do— But I'm just, I'm having, we have to raise a significant number of arguments that you didn't raise below in order to get us to the point that it would make sense to send it back on that question. Not, even assuming that you were right on the answer to that question. None of these arguments were presented below. No argument that you would come out differently. Instead, the papers below say that we're not disputing this for purposes, the facts for purposes of appeal, that we're not disputing it for purposes of the habeas. It seems to like you're posturing the case differently than it was postured before. Your Honor, there was simply no reason for us to discuss remand with the District Court. We were trying to make the argument to the District Court that detention authority had lapsed either as a statutory matter or as a constitutional matter, or that the relevant conflict had ended because Hamdi speaks of the relevant conflict. Those were the arguments we were presenting. There was no cause, obviously, to discuss what might happen on remand with the District Court. No, but you— But it's— There was cause to ask the District Court to apply a clear and convincing evidence standard for the same reason you're asking us to apply a clear and convincing evidence— for the same reason you're asking us to remand to the District Court to apply a clear and convincing evidence standard. Yeah, Your Honor, we are trying to explain that if our primary argument fails in the Court's view and the Court does not believe that there's a statutory limit to the detention authority or a constitutional limit, then at the very least, habeas at this point in time and the due process clause requires more robust habeas review. And that's, again, consistent with what Boumediene has said looking to Matthews v. Eldred. It's consistent with what Hamdi has said looking to the same due process case, that habeas review has to become more searching with the passage of time as the duration of detention stretches. Again, we're talking about Mr. Ali who has been at Guantanamo for over 16 years in a detention that is supposed to be, again, non-punitive and temporary. That is absolutely outrageous. What turns the law of war on its head is not our position in this case, Your Honor. It is the position of the government that somehow it's appropriate to continue to detain Mr. Ali at Guantanamo even though former law of war detainees who were charged and convicted as war criminals before the military commissions now walk free. We're not contending that that's inappropriate. They've served their sentences. But how does it make sense for purgatory to be worse than hell? How does it make sense for Mr. Ali to remain at Guantanamo as a law of war detainee who's not accused of war crimes while men walk free who are convicted war criminals? Certainly, the court has to step back in. Of course, Congress could have done something about it. Maybe the executive could have done something about it. But they haven't. And Mr. Ali remains there after 16 years. So at this point, someone has to put an end to the plight of men like Mr. Ali at Guantanamo. There aren't many of them left. We're only talking about 31 men here. There's 41 left at Guantanamo. Ten of them are in the military commission system. So the court can't step in there because of councilman comedy. But for Mr. Ali, who's been there for over 16 years, certainly habeas must mean more than just a determination on a preponderance of the evidence standard that would govern a slip-and-fall case based on stale evidence. Certainly, our Constitution requires more to maintain this man at Guantanamo on an ongoing basis, potentially for the rest of his natural life. Judge Anderson, do you have any further questions? I don't. Okay, thank you. Thank you, Your Honor. We'll hear from the government. Good morning. May it please the Court. Sonia Carson for the government. The United States is still fighting the same terrorist groups that all rejoined in the same country where he served them because they continue to attack. Two presidents have accordingly determined that the United States remains engaged in active hostilities, and under this Court's decision in al-Bahani and the long line of Supreme Court cases that preceded it, that assessment is entitled to deference. Now, the Court still has a meaningful role to play in assessing the lawfulness of detention under the AUMF. It can determine, of course, whether the AUMF is a lawful exercise of Congress's power. It can determine, and it has determined here, whether an individual petitioner is an enemy combatant, and it may, of course, decide whether the political branches have answered the political question and whether active hostilities continue. Pause for that last point. What if the facts could be proven, I don't know, by satellite pictures, that there is not a single American soldier in Afghanistan, not one, and that no American soldiers are involved in hostilities by any definition? This is a complete hypothetical. But the president continues to say there are hostilities, and perhaps for the purpose of being able to continue to detain the people. Would we be able, under those circumstances, to say those are not the facts, those are not the true and objective facts, and therefore the hostilities end? I have two responses, Your Honor. Of course, it is the nature of the political question doctrine that the inquiry ends once a court has determined whether or not the political branches have answered the political question. And so I think the first response in your case would be that because the president, and we'll say in the absence of contrary action by Congress, although in al-Bahani that consideration, too, would be relevant, I think the court's inquiry under the political question doctrine might well stop. However, of course, the Supreme Court in Mudeki reserved the question whether a war that was formally kept alive had in fact ended and explained that it might well at some point confront that question, but it did not that day, and this court does not today. Dozens of American service members have died. So you're not saying that under those circumstances we could not resolve the question. You're saying that, as in Mudeki, that we don't need to dissolve that question, and we certainly don't need to decide it until we absolutely need to decide it. So I think that's a fair characterization, Your Honor. My point is simply that we don't take issue with the question that the Supreme Court reserved in Mudeki. Mudeki remains the law. It is the basis for this court's decision in al-Bahani, which we rely on here. But the point of the political question doctrine is that when the Constitution commits a question to the political branches alone and the political branches provide an answer, that answer ordinarily is conclusive, and that is the circumstance that we have here. The rule that petitioner seeks would have dramatic ratifications not only for his own detention, but potentially for the detention of, as he says, 31 other Guantanamo detainees, for the conduct of ongoing military operations abroad, for our relationships with international partners, and, of course, for this court's rule that a decision of a prior panel binds future panels unless and until it is overruled by the en banc court or the Supreme Court. Now, let me say it is not our hope to detain Mr. al-Alawi indefinitely, but it is not entirely up to us. Al-Qaida and the Taliban continue to attack U.S. service members in Afghanistan, and the executive has determined that Mr. al-Alawi continues to pose a significant threat to U.S. national security, and it is for that reason that his continued detention remains necessary. As Mr. Qasem explained to the court, there is no question here that Mr. al-Alawi has been adjudicated to be a member of the groups against whom active hostilities continue. The AUMF authorizes detention for the duration of active hostilities, and that is sufficient to dispose of this case. Can I ask you why there's no reliance on the NDAA? Pardon me? The provisions of the National Defense Authorization Act, which— Yes, which reaffirms detention authority under the AUMF. Yes, but you don't—you spend a lot of time on Hamdi, and you don't really rely on the provision of the act which permits detention until the end of the hostilities. Is that because you think that the NDAA only applied to 2012, or was this a provision of an authorization act that was permanent? Your Honor, my understanding is that the provision is permanent, and we, of course, rely on it. Indeed, Judge Griffith, you were discussing Boumediene earlier, and there the court explained that the political branches can engage in debate about how best to preserve constitutional values while protecting the nation from terrorism. If anything, the 2012 NDAA is an example of just that debate, and it reaffirms that the AUMF permits detention for the duration of active hostilities. I think there can be no serious doubt here, and Petitioner has conceded that the fighting remains ongoing, that active hostilities endure, and thus the AUMF's detention authority authorizes Mr. Al-Aoui's detention. How does the review board, the periodic review board, go about making the determination that a detainee remains dangerous? So the periodic review board procedure is set out in the Executive Order in 2011 and was reaffirmed in January of 2018 in Executive Order 13-H23. Under the original Executive Order, which is 13-567, Section 2, the PRB considers whether continued law of war detention is warranted, and it is warranted if it is necessary to protect against a significant threat to the security of the United States. Now, the detainee is free to submit a statement to the PRB, as Mr. Al-Aoui has done repeatedly here. He may be represented by a personal representative by private counsel. He may call reasonably available witnesses. He may answer questions. And the PRB concluded, including within the last year, as of July of 2017, that there remained no significant question that Mr. Al-Aoui's continued detention is necessary to protect against a significant threat to U.S. national security, including in light of his continued extremist statements and the potential that he would be susceptible to recruitment by the same groups of which he was previously a member if he were to be released. I'm happy to discuss any other aspect of the case. As the panel's questions to Mr. Qasem, I think, illustrate, the Due Process Clause is foreclosed by circuit precedent, and in any event there's no reason to believe it would make any difference here. If the Court has no further questions, we ask that the judgment be affirmed. I just want to give Judge Henderson a chance, because I can't see whether she's... Of course. Thank you, Judge. I'm okay. Thank you. Okay. Thank you very much. Thank you. Is there time left? Counsel has 12 minutes left. Well, you can actually have 12, because opposing counsel left that for you. Thank you. With the Court's permission, I'd like to address these four points that just came up. But let me start with specifically forfeiture, the Court's authority, or it's the necessity of deference, the PRBs and the National Defense Authorization Act. On forfeiture, Your Honor, I just want to point out that, as Boumediene stressed, habeas avoids formalism. Habeas is supposed to be a flexible, adaptive remedy. The issues were briefed before this Court. They are all issues of law. The government does not make an expansive forfeiture argument or make a narrow forfeiture argument. It would be perfectly appropriate for this Court to resolve the issues of law that were fully briefed before it, rather than send it back down because of a more formalistic problem that the Court, in its discretion, can decide to opt out of. It is only a prudential rule. And again, Boumediene illustrates perfectly that the Court can do this because the Supreme Court itself and Boumediene did not remand to the D.C. Circuit on the adequacy of the CSRTs as a habeas substitute and made the decision itself. Which brings me to periodic review boards, Your Honor. The government has not argued that the periodic review boards are a substitute for habeas. But certainly, I just want to emphasize that this Court should derive no comfort from the fact that there is an ongoing periodic review board process. It is odd that the government is here today before this Court trying to make hay of the PRB process when, in other cases, where other petitioners brought the fact that they had been cleared by the periodic review boards to the attention of district judges, the government was the first to stand up and say that the PRBs are irrelevant to habeas. So surely, this Court cannot seriously entertain the notion that the PRBs are irrelevant unless their findings happen to coincide with the government's position. And I can go on all day about the deficiencies of the PRBs that make them, in many ways, worse than the combatant status review tribunals that the Boumediene Court rejected. When I meet with my client to discuss his upcoming periodic review board... I don't think it's necessary. I read the government's reference to this as an atmospheric response to your argument that he's really no threat, which is also not part of your substantive argument at this point. So I don't think either side is actually arguing about this question as an element of our ultimate... Well, Your Honor, even atmospherically, the PRBs' findings, wherever they are, are completely unreliable, and the reality is the PRBs are a smokescreen. This Court should not draw any comfort from the fact that our client might get released through the PRB process because the infrastructure of release has been dismantled by this administration. There is no one in place negotiating for the release of men who have been cleared by the periodic review board. There are five men who sit cleared at Guantanamo today. The government has admitted as much. They filed a brief on February 16th before the district court admitting that nothing was being done to permit the transfer of cleared men. I can give you the reference. That's 04-CV-1194. The ECF number is 1126. That filing admits that the PRBs are essentially ineffectual, and they're no substitute for habeas. It's a group of PRB, of executive branch bureaucrats, who are answering a different question, whether someone poses a significant security threat, whatever that means. And, again, they're answering that question arbitrarily and unreliably. But let me move on. Your Honor, on deference, very quickly, we argue in the alternative that, I mean, as our argument is structured in the brief, it should be clear that we do not concede that the relevant conflict is over. We've made the argument in the alternative. So I just wanted to respond to opposing counsel characterizing our position as a concession. On the point of deference, the government relies on Ludecky v. Watkins, but really the more relevant and recent reference point is Hamdi. And in Hamdi, the court looked at the record in order to answer questions about the conflict that was ongoing in Afghanistan in 2004. And so it's perfectly appropriate for courts to look at records. The fact that Hamdi refers to a record assumes that there is a court to review that record, and that's precisely what Hamdi did. Now, the ongoing nature of the conflict in Afghanistan was not a central issue in Hamdi, and so for that reason, the court looked to a press conference statement, the court looked to some media articles, and concluded that really there's no question that in 2004 there were active hostilities in Afghanistan. But it is the court's role to look at records. Do you object or dispute what I would describe narrowly as fact questions? How many soldiers are in Afghanistan? How many bombing runs there were? No, Your Honor. Things that are in the declaration. We don't dispute any of those. Yeah, we are not in a position to quibble with troop levels. Or whether our troops are being fired on, or whether our troops are firing on other people. You're not disputing that. Your Honor, there is a shooting war in Afghanistan. It involves U.S. elements, but the United States, respectively, is involved in many armed conflicts where it does not have detention authority, including the current conflict in Afghanistan. If Mr. Ali was detained in Afghanistan today. So just so I'm clear, so really what you're objecting to is the characterization. You're disputing the characterization of the facts. That is, do those facts, which are not disputed, mean that this is a different war or a different conflict than it was before? Have I got your point correctly? Your Honor, under our alternative argument, we believe those facts paint a picture of a different conflict. But even under our primary argument, when you look to the bilateral security agreement and you see that if the United States were to capture Mr. Ali in Afghanistan today, he could not be held there. The U.S. cannot run detention facilities in Afghanistan anymore as of January 1, 2015. The nature of U.S. involvement in Afghanistan is a significantly different practical circumstance of this conflict. It's different from the way the conflict looked in 2004 when Hamdi looked at it, and it's different from previous conflicts that informed the development of the law of war. Your Honor, the National Defense Authorization Act does not absolve the court of its responsibility to interpret the AUMF. The NDA affirms detention under the law of war, but that only really brings us back to Hamdi because it is the court's remit to define legal detention authority under the law of war and under the AUMF that's not precluded by the political question doctrine. We're not here contesting the validity of a bombing sortie in Somalia under the AUMF. That's a matter of military discretion that is precluded by the political question doctrine. We're here challenging the validity, the legality of Mr. Ali's ongoing detention, and that is squarely within the ambit of what this court is supposed to do. And again, it is the AUMF, not the NDAA, that the government relies on as the basis for its authority to detain Mr. Ali. So, Your Honor, if there are no further questions, I would just like to point out that, again, the wartime detention that Hamdi contemplated was supposed to be temporary and non-punitive. For Mr. Ali, 16 years at Guantanamo is neither. Had he been charged with providing material support under 2339A to terrorism, the conviction would have carried no more than 15 years in prison. He has now cleared his 16th year there. And so, for this court to respectfully be overly formalistic and to insist on rules having to do with forfeiture, when the issues are all issues of law that have been fully briefed, would be a manifest injustice, and it would impose the cost of delay on Mr. Ali. Because we'll be right back here a couple of years later litigating the same issues. So, the issues have been briefed very ably by both sides, certainly by the government and hopefully by our side as well. That's very humble of you. But, Your Honor, there's really no point in resting on those grounds to get rid of this case because, again, the court doesn't have to. Boumediene did not do that. This court has the discretion to rule on these issues. They're all issues of law. And so, this court should simply not be the first to accept that the tension under the AUMF for 16-plus years is consistent with our rule of law in a constitutional democracy. Surely, Boumediene's promise of habeas and surely our Constitution's guarantee of due process, which we believe extends to Guantanamo the same way that the suspension clause does, the same way that some members of this court have found that the ex post facto clause does. Do you think we're not bound by Kiamba? Your Honor, Kiamba 1, the holding in Kiamba 1 is narrow. So, the discussion there had to do with, I mean, I don't want to minimize, let me characterize Kiamba 1 as accurately as I can. Kiamba 1 had to do with the proposition that non-citizens detained by the United States outside of U.S. territory do not enjoy a liberty interest protected by the Constitution's due process guarantee that's sufficient to sustain a court order that they be released into the United States over the executive branch's objection. That was the issue in Kiamba. Those were the facts in Kiamba, making it a case essentially about executive control over immigration. Subsequent panels, including the panel in Kiamba 3, that reinstated the Kiamba 1 opinion but modified it. The way Kiamba 3 characterized the issue is more in line with what I just said. It characterized the issue as, quote, the right to be released into the United States, a constitutional right to be brought into this country and released. And even four justices of the Supreme Court, when they denied cert in Kiamba later in 2010, they also defined the issue narrowly as whether a district court may order the release into the United States where no other option is available. And so that really was the holding in Kiamba, Your Honor. It wasn't broader than that. It doesn't foreclose consideration of the issue by this panel. Your Honor, when you look to cases like Al-Baloo, that assumed without deciding that the Ex Post Facto Clause applied at Guantanamo, when you look to Armour, that again assumed without deciding that essentially substantive due process applied at Guantanamo because what it found, and Judge Griffith knows this well, what it found was the right to be free from unwanted medical treatment, which is traditionally a substantive due process inquiry. If Kiamba 1 were as broad as the government contends and were that preclusive, it would have left no room for such judicial assumptions, no room for even executive concessions because in Al-Baloo the government conceded that the Ex Post Facto Clause applies. And so, Your Honor, I won't dispute that the Ex Post Facto Clause and the Suspension Clause, as both of you noted in Al-Baloo, share constitutional real estate in Article I, Section 9. They're two peas in a pod in that way. But habeas corpus and due process have an even longer history together. And naturally, both Hamdi and Boumediene look to due process. So at this point in time, we believe that it is appropriate for this Court to revisit the question of detention authority looking to the due process entitlements of non-citizens in prison at Guantanamo because of how unique a place Guantanamo is. And the government hasn't disputed in its briefs our position that the same test that was rolled out by the Boumediene Court to determine the extraterritorial reach of the Constitution leads to the conclusion that the due process clause, too, reaches non-citizens detained at Guantanamo. The government has effectively conceded that by not disputing it in its briefs, Your Honor. And we think it's consistent, again, with assumptions that this Court has made and certainly with conclusions that members of this Court have drawn about the reach of the ex post facto clause for the same reason and what seemed to be an assumption about at least one substantive due process entitlement in AMR. Rassoul v. Myers is not to the contrary. That was a qualified immunity decision. I just wanted to address that quickly because it came up in the briefs. Other questions? Judge Henderson? No. Okay. Thank you very much. We'll take the matter under submission. Thank you.
judges: Garland, Henderson, Griffith